(38 Misc. Rep. 309.)

### KERNGOOD et al. v. JACK et al.

(Supreme Court, Special Term, New York County. June, 1902.)

1. ATTORNEYS—EQUITABLE LIEN.

> An attorney's lien for services rendered an executor under an agreement with him made before he became such will not be enforced against a bank in which the moneys of the estate are deposited, nor against his surety having possession of checks drawn by him for payments which he agreed to make before he became executor to the widow of the testator, who had threatened to contest the will, and to another woman, who also claimed as widow, and to his attorneys and to himself, where the attorney's lien is only against his share, which cannot be determined, and where the proposed scheme was entered into in derogation of the rights of other creditors and legatees.

Action by Norman W. Kerngood and Edwin L. Kalish against James C. Jack and others. Complaint dismissed.

Sullivan & Cromwell (J. Culbert Palmer, of counsel), for plaintiffs.
Wing, Putnam & Burlingham, for defendant Jack.
G. Ewald Menzel, for defendant American Bonding & Trust Co.
Adams & Adams, for defendant Garfield Nat. Bank.

CLARKE, J. · Samuel T. Jack died in the city of New York, April 27, 1899. Upon the day of his death he made his last will and testament. Said instrument was prepared by his brother, the defendant James C. Jack. Said will provided:

"First, after my lawful debts are paid, I give and bequeath the money which I possess, which is in· the main as follows: In the Garfield vault, New York City, forty-four thousand dollars; in Chicago vaults, about eight thousand dollars ($8,000); in the First National Bank of Chicago, in Emma's name, four thousand dollars ($4,000); rent paid in advance on New York theater, about four thousand dollars,—making in all a total of sixty thousand dollars. It is my wish first and foremost that my brother James and my wife, Emma, become husband and wife. I give and bequeath my money enumerated above, augmented by any other money or moneys I possess, to the following persons, whom I make my sole heirs, to wit: To my wife, Emma, one-third of the whole amount. To my brother James C. Jack, one-third of the whole amount. To the following heirs the remaining one-third, to be distributed equally, all shares being of same amount: My father, William S. Jack; my mother, Susan Jack; my sister, Rebecca Clark; my nephews and nieces. as follows: Katherine Baer, Bertie Davis, Sam Jack Brigham, Charles F. Brigham, Richard Brigham, Victoria Clark, Nellie Clark, Susan Clark, Thomas Clark, Arthur Clark, Jules V. Jack, Louis Jack, and Elena Jack."

And he appointed his wife, Emma, and his brother, James C., executors thereof. He also executed a codicil as follows:

"To my brother, James C. Jack, whom I appoint to conduct and continue my business, I give and bequeath the leases of my two theaters, one in New York City and the other in Chicago, and all my theatrical plays, burlesques, wardrobe, and other theatrical properties; also the exclusive right to my name as a trade-mark, which is to be used under the sole and exclusive direction of my said brother, James C. Jack."

Thus, outside of the provisions as to the theatrical business, covered by the codicil, the estate was left one-third to Emma, one-third to James C., and the remaining one-third in equal shares to 16 relatives. The will and petition for probate verified by the two executors were filed June 1, 1899, one Richard F. Price appearing as attorney for petitioners. Mr. Price also procured and filed waivers of citation by the decedent's father and mother, the only next of kin set forth in the petition, and also the oath of James C. Jack, as executor, and also secured from the proponents a contract to pay him $10,000 for his services. Subsequently Emma, appearing by another attorney, endeavored to withdraw the petition for probate, and threatened a contest. After several negotiations and proceedings, Price dropped out of the case, and Kerngood and Kalish came into it, after several contracts for their services had been made, under the written contract upon which this suit is based. This contract, executed on the 1st day of November, 1899, after reciting the proceedings down to the withdrawal of Emma's petition for probate, proceeds: "Whereas, the said James C. Jack is desirous of having said last will and testament admitted to probate, * * * and of obtaining his legacies thereunder, and of distributing said estate, and of performing such other duties as by law are required of an executor to settle up the estate of said deceased," and desired to engage and continue the legal services of said Kerngood and Kalish, it was agreed "that the said parties of the second part will prosecute such actions and proceed-

ings as in their judgment may be necessary to have said last will and testament of Samuel T. Jack admitted to probate, and to collect and recover the legacies due the party of the first part thereunder, and to perform all other legal services that may be necessary to enable the party of the first part to perform the duties as an executor of said will, including the settlement of his account as such executor." It was agreed that Jack should pay to Kerngood and Kalish such sum or sums of money as might be fair and reasonable compensation for the services rendered. It was agreed "that such compensation to be paid to the parties of the second part shall be a lien on the share or interest of the party of the first part in and to the estate of Samuel T. Jack, deceased"; also that such compensation was to be at such times and in such amounts as might be agreed on as the work progressed; and finally it was agreed "that no compromise or settlement of rights or interests of the party of the first part in and to the legacies due him under said last will and testament in any of said actions or proceedings or otherwise shall affect the obligation of the party of the first part to the parties of the second part herein." There was an examination of the safety deposit box in the vaults of the Garfield Safety Deposit Company, which disclosed about $46,000 in cash. In the meantime the contest of the probate of the will by Emma Jack had been disposed of by an agreement between herself and James C. Jack, dated December 9, 1899, in which she agreed to withdraw her contest of the will, and also to renounce as executrix on condition that James C. Jack should give an executor's bond in the sum of $80,000; that she should release any and all her right, title, and interest in any of Sam T. Jack's estate, except the property in Chicago (that is, the theater in that city, $8,000 in vault, and $4,000 in bank in Chicago), and $15,540.84, one-third of the money in the Garfield vaults, which was to be paid to her, less $138.40, to be retained for transfer tax, and less $1,700, to be retained as a deposit against liability for the making of this contract; making net payment to Emma, $13,702.44. Said contract further provided that Emma was to pay her own lawyers, but should in no wise be liable for legal services to James C. Jack performed in his behalf in the matter of the estate of said deceased, or hereafter to be performed in the same matter as such executor either by Norman W. Kerngood or Edward L. Kalish, his present attorneys, or any other person. By this contract, Emma, who had been given in the will one-third of the estate, subject, of course, to payment of administration expenses and decedent's debts, acquired not only all the moneys, properties, leases, etc., in Chicago, which the decedent had specified in his will as belonging to himself, but also a clear one-third of the moneys in New York.

Prior to the execution of this contract, but after the plan had been substantially agreed upon, arrangements were made to secure the $80,000 executor's bond from the American Bonding & Trust Company. Jack entered into the usual agreement with the company, dated December 18th. It provided that the estate funds should be deposited in the Seventh National Bank in the joint names of the executors and bonding company. It represented that the assets of

the estate consisted of $46,600 in the Garfield Safe ·Deposit vaults, and that the liabilities of the estate were about $5,000. In the meanwhile another alleged widow, Mabel Hazelton Jack, with daughter by Sam T. Jack, had turned up with a claim and a threat of contest. The plan agreed upon in its various phases contemplated a payment out of the cash in the ' Garfield Safe Deposit vaults, which, under the settlement with Emma, constituted the entire assets of the estate, not only of the $13,702.44 to Emma, but also under an assignment of James C. Jack of one-half of his legacy to Mabel Hazelton Jack, a payment of $4,000 on account thereof, to Kerngood and Kalish of $4,500, to Jack himself $500 because he was out of funds,—a total of $22,702.44, approximately one-half of the assets,—and this without regard for or notice to the. other legatees, or advertisement for or ascertainment of the debts of the estate. Not only this, but according to the testimony of the plaintiffs it was part of the plan that this $22,702.44 should be virtually taken from the estate before Jack's appointment as executor. The scheme was to have Jack sign checks upon the Seventh National Bank, as executor, for the several payments agreed upon before his appointment as executor, and before such appointment deliver such checks to the bonding company, and to get the bonding company to hold them, and, as soon as Jack was appointed and the moneys deposited in the Seventh National, to countersign them and to deliver them. The checks were actually drawn and signed by James C. Jack, as executor, and delivered to the bonding company. The check for Emma read: "Pay to the order of Adolph Marks, attorney for Emma Jack, payment of distributive share of Samuel Jack, deceased, $13,702.44." The three other checks read: "Pay to the order of James C. Jack, part payment of distributive share of estate of Samuel Jack, deceased," for $4,500, $4,000, and $500, respectively. There was a few days' delay in the counting and transfer of the cash from the safety deposit vaults to the bank, and when delivery of the checks was demanded of the bonding company it refused to deliver.

This suit is brought by Kerngood and Kalish against James C. Jack, individually and as executor, the American Bonding & Trust Company, and the Garfield National Bank, in which some of the money was deposited, and judgment is demanded that their equitable lien upon the fund and interest in said fund be declared, established, and enforced, and that there be paid to them out of said fund the amount of said check, and that the defendants, and each of them, and their agents, etc., be forever and pending this action enjoined and restrained from assigning, transferring, paying out, or in any manner disposing of so much of the said fund as shall equal $4,500, besides any damages which the plaintiffs have sustained or may sustain by reason of defendant Jack's breach of said contract, etc. In the application for the bond made to the bonding company it was stated that the liabilities were $5,000. It now appears that the debts, ascertained in the manner provided by law, amount to $22,700, in addition to a liability under the lease of the New York theater, reduced by settlement from $50,000 to $15,000, which may or may not be a charge against the estate. If this should be an estate liability, it would leave over

and above the debts about $9,000, of which the 16 legatees are entitled to a third, and subject to expenses of administration. I am unable to perceive any equitable claim that these plaintiffs can maintain, certainly as far as the estate is concerned. Their services were not rendered to and for the estate in such manner that it is chargeable against it in the first instance. The scheme devised and attempted to be put in operation by them was to dispose of a large portion of the estate in advance of orderly and proper administration in derogation of the rights of creditors and legatees. While it may have been to James C. Jack's personal benefit to buy off claimants and probate the will in order that he might secure his own legacy, it certainly was not to the advantage of the creditors nor of the father of decedent. It seems to me quite clear that plaintiffs knew and had in mind that whatever claim they had was against James C. Jack individually and his share. So far as Jack is concerned, it is difficult to account for his actions and proceedings as disclosed by all the evidence, and especially his own. If this case were between plaintiffs and Jack alone, I might reach a different conclusion. But as the conclusion which I reach is that whatever remedy plaintiffs have is against Jack individually, in his capacity as legatee, and that their lien, if any, is only against his legacy of one-third, when ascertained, and as that one-third cannot now be ascertained, and as their contract, if good, was for fair and reasonable compensation for the services rendered, I fail to see how at this time any lien for any specific sum can be impressed upon this unascertained legacy. As this whole scheme of anticipating the orderly distribution of this estate in derogation of the rights of creditors and legatees seems to me highly improper, and, if carried out, might have led to a devastavit of the estate, I do not see any reason for the interposition of a court of equity.

Complaint dismissed, with costs to bonding company and Garfield National Bank.